**CROMAN CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 01–40 C.

United States Court of Federal Claims.

Aug. 9, 2010.

Alan I. Saltman, Washington, DC, for plaintiff. Richard W. Goeken, Washington, DC, of counsel.

William P. Rayel, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## ORDER AND OPINION

HEWITT, Chief Judge.

Before the court are Defendant's Motion to Reopen Fact Discovery for the Limited Purpose of Conducting Discovery Related to Potential Fraud Counterclaims (defendant's Motion or Def.'s Mot.), Docket Number (Dkt. No.) 88, filed on June 7, 2010; Plaintiff's Response to Defendant's Motion to Reopen Fact Discovery (plaintiff's Response or Pl.'s Resp.), Dkt. No. 93, filed on July 6, 2010; and Defendant's Reply to Plaintiff's Response to Defendant's Motion to Reopen Fact Discovery for the Limited Purpose of Conducting Discovery Related to Potential Fraud Counterclaims (defendant's Reply or Def.'s Reply), Dkt. No. 94, filed on July 15, 2010. Further to a request from plaintiff and with the agreement of both parties, the court heard oral argument on defendant's Motion on Tuesday, July 27, 2010.[1] *See* Order of July 19, 2010, Dkt. No. 95. For the following reasons, the court DENIES defendant's Motion.

## I. Background

Croman Corporation (Croman or plaintiff) claims damages related to the government's suspension of the Clearview timber sale contract following the 1992 listing of the marbled murrelet as a threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531–1544. Pl.'s Resp. 3; *see* Def.'s Mot. 2. The contract involved the sale and harvest of timber located in the Happy Camp Ranger District of Klamath National Forest in California. 1998 Compl. ¶ 5. Under the contract, the United States Forest Service (Forest Service), an agency of the United States Department of Agriculture, was "to sell and permit Croman to cut, remove, and pay for Included Timber." 1998 Compl. ¶¶ 3, 8. As a result of the listing of the marbled murrelet by the United States Fish and Wildlife Service in 1992, the Forest Service suspended Croman's operations under the contract. 1998 Compl. ¶¶ 11, 27, 28. The suspension lasted for approximately three years until August 28, 1995. 1998 Compl. ¶ 28. On May 1, 1997, Croman submitted to the contracting officer a certified claim for damages (1997 claim), alleging that the unauthorized suspension occurred on or about September 28, 1992. Pl.'s Resp. 3; Def.'s Mot. 2. The 1997 claim was denied on September 11, 1997, and Croman subsequently filed suit in this court on April 24, 1998 (1998 Complaint, Case No. 98–405C). Pl.'s Resp. 3; 1998 Compl. 1. Croman's 1997 claim focused primarily on damages sustained at its Ashland, Oregon sawmill, the facility where the Clearview timber was to have been transported for processing. Pl.'s Resp. 3, 6.

In 1999, based on records located after Croman had filed suit, Croman alleged that the suspension had occurred in late July 1992, rather than in late September 1992. Pl.'s Resp. 4; Def.'s Mot. 2. This court determined that it did not have jurisdiction over Croman's alternative claim for damages resulting from a July 1992 suspension because the claim had not been submitted to the contracting officer. *Croman Corp. v. United States*, 44 Fed.Cl. 796, 800–02 (1999); *see*

---

1. The oral argument held on July 27, 2010 was recorded by the court's Electronic Digital Recording system (EDR). The times noted in citations to the oral argument refer to the EDR record of the oral argument.

Pl.'s Resp. 4; Def.'s Mot. 2. Accordingly, on November 1, 1999 Croman submitted to the contracting officer a second certified claim for damages (1999 claim), alleging that the suspension occurred on or about July 31, 1992. Pl.'s Resp. 5; Def.'s Mot. 2. Croman also modified its claim for damages by "seeking significantly less than the amount claimed in the 1997 claim based on a view of the damages from the perspective of impacts to Croman's operations at its Boise sawmill." Pl.'s Resp. 5. According to plaintiff, Croman was operating sawmills in Ashland, Oregon and Boise, Idaho, when the Clearview timber sale was suspended. Pl.'s Resp. 5 n. 7. Plaintiff contends that it hauled additional timber from the Boise sawmill to the Ashland sawmill in order to fill the void at the Ashland sawmill that was caused by the Clearview suspension. *Id.* According to plaintiff, the modification of its damages claim was made "[i]n an effort to avoid any future arguments about what had (and had not) been presented to the contracting officer and the potential need to submit yet other prophylactic claims." Pl.'s Resp. 5. Plaintiff contends that it was clear that the 1997 and 1999 claims were made in the alternative as permitted by the Rules of the Court of Federal Claims (RCFC). Pl.'s Resp. 5 & n. 8 (citing RCFC 8(a)(3), (d)(3)).

The contracting officer determined that he did not have jurisdiction to address the issues raised in the 1999 claim because "[t]he legal allegations raised in Croman's November 1, 1999[ ] claim [we]re pending before the United States Court of Federal Claims." Pl.'s Resp.App. 37–38. As a result of the contracting officer's deemed denial of the 1999 claim, Croman filed suit in this court on January 22, 2001 (2001 Complaint, Case No. 01–40C). *See* Pl.'s Resp. 8; 2001 Compl. 1, ¶ 52 (stating that because "more than 60 days have passed since Croman submitted its second claim, Croman's November 1, 1999 [Con-tract Disputes Act (CDA) ] claim was denied or must be deemed denied.").

After this court ruled that the timber contract at issue provided authority for the government to suspend performance unilaterally, *Croman Corp. v. United States,* 49 Fed. Cl. 776, 783–84 (2001), the United States Court of Appeals for the Federal Circuit (Federal Circuit) vacated and remanded for further proceedings in light of the Federal Circuit's decision in *Scott Timber Co. v. United States (Scott Timber),* 333 F.3d 1358 (Fed.Cir.2003). *Croman Corp. v. United States,* 89 Fed.Appx. 237, 238 (Fed.Cir.2004) (unpublished decision). The Federal Circuit agreed with Croman that it was appropriate to vacate and remand, given that "in *Scott Timber* [the Federal Circuit] determined that a contractual clause substantially similar to the one at issue in this case did not authorize the government to suspend unilaterally work on a contract." *Id.* According to plaintiff, as a result of the Federal Circuit's decision vacating and remanding this court's earlier determination, "the government has conceded the issue of liability here and, since 2006, the parties have been engaged in an ... amicable effort to better quantify those damages, first through efforts of counsel then via review by expert witnesses." Pl.'s Resp. 9 n. 11.

Croman's alleged damages at its Boise sawmill provide the basis for defendant's Motion to Reopen Fact Discovery currently before the court.[2] Def.'s Mot. 1; Pl.'s Resp. 8. Defendant filed its Motion on June 7, 2010, seeking an order from the court reopening fact discovery, which closed on February 19, 2010. *See* Def.'s Mot. 1; Order of Jan. 19, 2010. Defendant states the purpose of its Motion to reopen discovery as follows:

so that defendant may conduct limited discovery regarding whether plaintiff's claim for damages related to a reduction in the production of its sawmill in Boise, Idaho,

---

2. Because plaintiff alleged damages related to the Boise sawmill only in its 1999 claim and 2001 Complaint (Case No. 01–40C), the issues raised in Defendant's Motion to Reopen Fact Discovery for the Limited Purpose of Conducting Discovery Related to Potential Fraud Counterclaims (defendant's Motion or Def.'s Mot.) pertain only to Case No. 01–40C. *See* Plaintiff's Response to Defendant's Motion to Reopen Fact Discovery (Pl.'s Resp.) 1 & n. 2. However, defendant filed an identical motion in Case No. 98–405C pursuant to the court's Order of December 12, 2005. Def.'s Mot. 1 n. 1. Because the parties filed identical briefing in both dockets, the court addresses the two outstanding Motions by issuing identical opinions in both cases.

during fiscal year ("FY") 1993 (October 1992–September 1993), gives rise to counterclaims pursuant to: 1) the anti-fraud provision of the Contract Disputes Act ("CDA"), 41 U.S.C. § 604; 2) the False Claims Act, 31 U.S.C. § [§ ] 3729–3731; and/or 3) the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514 (special plea in fraud).

Def.'s Mot. 1. Specifically, defendant seeks the opportunity to submit additional interrogatories and document requests to Croman and to depose the individuals identified by the interrogatory responses as being involved in the claim preparation process, as well as Messrs. Kaufman, Hill and Cross—three individuals who have already provided deposition testimony or declarations regarding Croman's operations and damages claims. *See* Def.'s Mot. 7–8; Pl.'s Resp.App. 77–78.

II. Legal Standards

The Rules of the United States Court of Federal Claims (RCFC) contain general provisions governing discovery, including discovery scope and limits. *See* RCFC 26. RCFC 26(b)(1) provides a general rule as to the scope of discovery but also expressly provides for limits to discovery: *"Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.... All discovery is subject to the limitations imposed by RCFC 26(b)(2)(C)."* RCFC 26(b)(1) (emphasis added). RCFC 26(b)(2)(C) provides:

On motion or on its own, the court must limit the frequency or extent of discovery

otherwise allowed by these rules if it determines that:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

RCFC 26(b)(2)(C)(i)-(iii).

"A trial court has wide discretion in setting the limits of discovery." *Schism v. United States*, 316 F.3d 1259, 1300 (Fed.Cir. 2002) (internal quotation marks omitted). In particular, a trial court has discretion in deciding whether to grant a motion to amend a pleading and reopen discovery. *See Te-Moak Bands of W. Shoshone Indians of Nev. v. United States*, 948 F.2d 1258, 1260 (Fed. Cir.1991) (citing *Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403 (Fed.Cir.1989)); *see also Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1322–23 (Fed.Cir.2010) (applying Ninth Circuit law and concluding that the trial court did not abuse its discretion in denying defendants' motion to amend their answer and reopen discovery related to potential affirmative defenses).[3]

---

3. In this case, defendant has filed a motion to reopen fact discovery, not a motion to amend its pleadings. *See* Def.'s Mot. 1. The court finds the *Wordtech* case to be sufficiently analogous, however, to lend support to the court's determination here. *See Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc. (Wordtech)*, 609 F.3d 1308, 1322–23 (Fed.Cir.2010). In *Wordtech*, the Federal Circuit concluded that the trial court did not abuse its discretion in denying defendants' motion to amend their answer and reopen discovery related to potential affirmative defenses. *Id.* The Federal Circuit noted that defendants filed their motion five months after the trial court's final scheduling order, three months after the close of

discovery, and more than two years after they should have known of their defenses based on their expert's report. *Id.* The defendants offered no explanation for the delay in the filing of their motion, and the plaintiff protested that it would suffer prejudice from additional discovery for these defenses. *Id.* Under Ninth Circuit law, "[a] need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion...." *Id.* (internal quotation marks omitted). Considering all of these factors, the Federal Circuit concluded that the trial court did not abuse its discretion in denying the defendants' motion. *Id.*

III. Analysis

A. Defendant "Has Had Ample Opportunity to Obtain the Information by Discovery in the Action"

█ Fact discovery in this case closed on February 19, 2010. Order of Jan. 19, 2010. Defendant filed its Motion on June 7, 2010, nearly four months later. *See* Def.'s Mot. 1. Ever since plaintiff's claims were filed in 1997 and 1999 and throughout the intervening years of discovery, defendant has had before it the substance of plaintiff's claims. Specifically, plaintiff filed its claim for damages related to decreased production at its Boise sawmill with the contracting officer on November 1, 1999 and with this court on January 22, 2001. *See* Pl.'s Resp. 5; Def.'s Mot. 2; 2001 Compl. 1. Defendant's interest in pursuing possible fraud counterclaims is no doubt prompted in part by the Federal Circuit's opinion in *Daewoo Engineering & Construction Co. v. United States (Daewoo)*, 557 F.3d 1332 (Fed.Cir.2009), regarding fraud counterclaims under the Contract Disputes Act and the False Claims Act, and forfeiture of fraudulent claims under 28 U.S.C. § 2514 (special plea in fraud). *See Daewoo*, 557 F.3d at 1333, 1335. The court notes that the Federal Circuit issued its *Daewoo* opinion on February 20, 2009, and that the appellate decision was largely an affirmation of the trial court's opinion, which was issued on October 13, 2006. *See id.* at 1332–33; *Daewoo Eng'g & Constr. Co. v. United States*, 73 Fed.Cl. 547 (2006). The substance of both plaintiff's November 1999 claim and the *Daewoo* opinions were available—and

presumably known—to the government well before the close of fact discovery on February 19, 2010.

Defendant explains that it simply was not focused on the portion of plaintiff's 1999 claim for damages related to decreased production at its Boise sawmill during fact discovery in the case:

> Because Croman was no longer claiming any damages as a result of a reduction in manufacturing at its Boise sawmill in FY 1993, Government counsel did not ask any questions relating to Croman's basis for these aspects of its claims during the February 2010 depositions, nor was he at all focused upon these aspects of Croman's claims. Accordingly, Government counsel did not realize that the Government may potentially be able to assert fraud counterclaims until recently when he was reviewing Croman's November 1999 certified claim, January 2001 complaint and July 2006 letter.

Def.'s Mot. 8. The court recognizes that this narrowed focus during discovery may have been an efficient litigation strategy, given the limited time and resources available to government counsel. However, the court does not agree that this choice on defendant's part warrants a reopening of fact discovery in this case. In the court's view, "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action."[4] RCFC 26(b)(2)(C)(ii). Based on this determination, the court declines to reopen fact discovery nearly six months after it

---

4. At oral argument, plaintiff pointed out that it has already provided defendant with a substantial amount of information regarding the basis for its claim. *See* Oral Argument of July 27, 2010, Argument of Mr. Richard Goeken at 10:31:05–10:31:18, 10:31:44–10:32:03. Among the information plaintiff cited, *see id.*, was a letter from plaintiff's counsel to Department of Justice attorney John S. Groat, providing an explanation and attachments "to support the amount of Croman's claim against the Forest Service," including Croman's claim for damages related to its Boise sawmill, Pl.'s Resp.App. 39, 49–51. Plaintiff further noted that plaintiff withheld nothing from defendant during discovery based on privilege, including attorney-client privilege. Oral Argument of July 27, 2010, Argument of Mr. Richard Goeken at 10:33:35–10:34:30, 10:35:57–10:36:12 ("We gave them ev-

erything. . . . We produced everything to the government."); *see, e.g.*, Def.'s Reply 3 & n. 5; Def.'s Reply App. 1–9 (April 9, 1999 letter from plaintiff's counsel to Mr. Dwain Cross with handwritten notes responding to counsel's questions regarding the damages calculations for Croman's 1999 claim). Plaintiff also pointed out that, to the extent possible, plaintiff made available to defendant for deposition and provided declarations from those individuals knowledgeable about its claim preparation process. *See* Oral Argument of July 27, 2010, Argument of Mr. Richard Goeken at 10:32:38–10:32:47, 10:33:10–10:33:34 ("Everybody at Croman is on record."); Def.'s Mot.App. 31–36 (deposition testimony of Mr. Kaufman and Mr. Hill); Pl.'s Resp.App. 60–78 (declarations of Mr. Hill, Mr. Kaufman, Mr. Saltman and Mr. Arnold Cross).

closed on February 19, 2010. *See* RCFC 26(b)(2)(C); Order of Jan. 19, 2010.

### B. Circumstances Do Not Warrant Reopening of Fact Discovery

■ The court acknowledges the possibility that certain circumstances could warrant the reopening of discovery in order to allow a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" as is generally permitted under the RCFC. RCFC 26(b)(1). In the court's view, even if the court had not made the determination that defendant "has had ample opportunity to obtain the information by discovery in the action," RCFC 26(b)(2)(C)(ii), the circumstances of this case do not warrant a reopening of fact discovery nearly six months after it closed. In its Motion defendant posits that Croman's claim for damages related to decreased production at its Boise sawmill is *"objectively* baseless." Def.'s Mot. 2. This contention is the major basis for defendant's request for additional discovery to evaluate Croman's *"subjective* basis for its assertion that the Boise sawmill operated at less than full capacity in FY 1993." *Id.* However, the court does not agree with defendant that Croman's claim for damages related to decreased production at its Boise sawmill is "objectively baseless."

### 1. Usage of the Terms "At Capacity" and "Full Capacity"

In its Motion, defendant asserts that "[t]he February 2010 deposition testimony of Croman's co-owner/president Bud Kaufman, and Croman's sawmill operations manager, Mike Hill, demonstrate[s] . . . that Croman's Boise sawmill operated at full capacity in FY 1993." Def.'s Mot. 1–2. According to defendant, it was this testimony that "raised serious questions regarding whether portions of Croman's November 1999 certified claim might have been submitted recklessly and/or with the intent to defraud or mislead the Government." *Id.* at 5. In response to the deposition question "Did the Boise mill run at capacity in the '93–through–'96 time period?" Mr. Kaufman responded, "Full capacity, two shifts." Def.'s Mot.App. 33. In response to the question "From 1990 to 1997, was there—do you recall any time when Boise

was not running at capacity?" Mr. Hill responded, "[J]ust before we shut down, we cut back to a single shift again because of lack of material." Def.'s Mot.App. 36. From this testimony, defendant concludes that the portions of Croman's 1999 claim related to "lost profits and unamortized fixed costs based upon a reduction in production at the Boise sawmill in FY 1993" are clearly false. Def.'s Mot. 7.

Plaintiff has provided declarations from Mr. Kaufman and Mr. Hill regarding their usage of the terms "at capacity" and "full capacity" to refer to a profitable, two-shift operation at the Boise sawmill, in contrast to an unprofitable, one-shift operation. Pl.'s Resp. 12–13. Both men stated in their declarations that "[they] did not mean 'at capacity' in the sense that no more logs could have been processed at the Boise sawmill during those years." Pl.'s Resp.App. 61, 67. According to plaintiff, Croman could have added hours to the typical eight-hour shifts, added Saturday shifts, or operated on a three-shift basis. Pl.'s Resp. 13–14; Pl.'s Resp.App. 61, 67. At oral argument, plaintiff's counsel suggested, in response to an inquiry from the court, that a maximum production-type operation would most likely be referred to as a "three-shift" basis, rather than "at capacity" or "full capacity." Oral Argument of July 27, 2010, Argument of Mr. Richard Goeken at 10:36:41–10:37:07. The court has no basis on which to disregard plaintiff's explanation of the meaning of the terms "at capacity" and "full capacity" in reference to the operations at Croman's Boise sawmill. The court notes that government counsel did not ask Mr. Kaufman and Mr. Hill at their depositions what they meant by the terms "at capacity" and "full capacity," although he had the opportunity to do so. *See* Oral Argument of July 27, 2010, Argument of Mr. Richard Goeken at 10:57:27–10:57:32; Def.'s Mot. 5, 8; Def.'s Mot.App. 32–33, 35–36.

### 2. Processing of Additional Logs and Potential Impact on the Longevity of the Boise Sawmill

In its Reply, defendant argues that "Croman's assertion that, absent the Clearview

suspension, it would have processed an additional 6,400 [5] MBF [ (thousand board feet) of logs] at its Boise sawmill in FY 1993 is inconsistent with the earlier deposition testimony of its sawmill manager, Michael Hill, as well as contemporaneous documentation from its claim preparation process." Def.'s Reply 2. Defendant argues that statements made by Mr. Hill [6] and Croman's co-owner, Dwain Cross, suggest that "Croman did not lose the opportunity to process logs at its Boise sawmill in FY 1993 by transferring logs from Boise to Ashland, but rather, Croman potentially lost the opportunity to keep logs in reserve and use them later, *i.e.,* approximately 1997 or 1998, to keep the Boise sawmill operating longer." *Id.* Defendant points to Mr. Hill's deposition testimony and to a response to an April 9, 1999 letter from plaintiff's counsel to Mr. Dwain Cross produced during discovery. *Id.* at 2–3. In response to a question asked during his deposition, Mr. Hill stated: "[The transfer of logs from Boise to Ashland] cut our longevity, our time of running Boise, because we did not have as much product as we should have had. In the end, we may have r[u]n another year or two." Def.'s Mot.App. 36. Among the questions asked in the April 9, 1999 letter from plaintiff's counsel to Mr. Dwain Cross was a question about the impact of the transfer of logs from Boise to Ashland on the Boise sawmill operation. Def.'s Reply App. 8. The response indicated that the transfer of logs "lessened the [Boise sawmill] operation causing us to shut-down sooner." *Id.* From these statements, defendant concludes that "Croman would not have processed additional logs at its Boise sawmill during FY 1993, [and

that] Croman's 1999 claim is, in fact, 'false.' " Def.'s Reply 4.

In its Response, plaintiff asserts that Croman's 1999 claim for damages related to the Boise sawmill was made "in good faith, and in a clear belief that the supporting data was accurate and complete and that the amount requested accurately reflected the contract adjustment for which Croman believed the United States was liable." Pl.'s Resp. 7–8. Plaintiff's counsel had asked Croman's vice-president, Toni Hicken,[7] whether the volume of logs that was transported from Boise to Ashland would have been processed at the Boise sawmill in FY 1993 absent the Clearview suspension. Pl.'s Resp. 7. According to plaintiff's counsel, Ms. Hicken responded that "after a review of the facts and circumstances, including the quality of the wood transferred from Boise to Ashland, the market for lumber products during FY 1993 and the level of operations at Boise, . . . Croman certainly could have run additional logs in the amount of at least 6,481 MBF through its Boise sawmill, such as by adding Saturday operations, and in light of the exceptionally strong market for lumber products, Croman would have done so." Pl.'s Resp.App. 73.

a. Whether Croman Could Have Processed Additional Logs at Its Boise Sawmill in FY 1993

Defendant argues that plaintiff's assertion that it could have processed an additional 6,400 MBF at its Boise sawmill in FY 1993 is inconsistent with the documentation provided by plaintiff as support for its assertion. Def.'s Reply 4–5. Mr. Kaufman and Mr. Hill both stated in their declarations that "[e]ven operating two eight-hour shifts per day (*i.e.,*

---

5. The parties use various figures to refer to the additional volume of logs, primarily 6,400 MBF or 6,481 MBF. *See, e.g.,* Def.'s Mot. 3; Pl.'s Resp. 8, 10 & n. 12, 15. The court understands that, whichever figure is used, the figure represents the volume of logs that Croman transferred from its Boise sawmill to its Ashland sawmill to fill the gap in its supply left by the Clearview suspension. *See* Oral Argument of July 27, 2010, Argument of Mr. William Rayel at 10:02:56–10:03:44.

6. In his declaration, Mr. Hill stated that, in his role as Croman's Manager for Sawmill Operations, "[he] was not responsible for the decision to transfer logs from Boise to the Ashland sawmill, nor did [he] decide how many logs would

be processed at the Boise sawmill." Pl.'s Resp. App. 60.

7. Toni Hicken was "the person at Croman who had been most substantially involved in preparing the 1997 claim." Pl.'s Resp. 7. According to defendant, "Ms. Hicken has since died and, thus, the Government was unable to depose her during the damages discovery period." Def.'s Reply 3 n. 4. The court notes that, given Ms. Hicken's unavailability, plaintiff has provided defendant with declarations and information from other individuals related to Croman's claim preparation process. *See supra* note 4.

sixteen hours per day), five days per week, the Boise sawmill was capable of processing in excess of 3,700 MBF of logs per month and did so during a month in FY[ ] 1993." Pl.'s Resp.App. 61, 67. Defendant points out that the October 1992 Boise sawmill production report, attached to the declarations of Mr. Kaufman and Mr. Hill and filed with plaintiff's Response, stated that the sawmill was operated a total of 402 hours that month. Def.'s Reply 5. Because October 1992 contained 22 business days, defendant calculates that the sawmill actually operated 50 hours more than the 352-hour total that would be expected based on plaintiff's assertion of a typical operating schedule (sixteen hours per day, five days per week). *Id.* At oral argument, the court noted the error in plaintiff's assertion that the sawmill operated two eight-hour shifts per day, five days per week, in October 1992. *See* Oral Argument of July 27, 2010, at 10:24:33–10:25:08. Plaintiff's counsel pointed out that the math works out to roughly eighteen hours per day or three Saturdays per month, so that the larger proposition would still hold true: Croman could have processed the additional logs at its Boise sawmill in FY 1993. Oral Argument of July 27, 2010, Argument of Mr. Richard Goeken at 10:38:22–10:39:13.

Croman's 1999 certified claim letter stated: "[A]s a result of having to transfer a substantial quantity of logs to Ashland, our operations in Boise had to be cut back, *i.e.*, we lost the opportunity to process the logs that had to be diverted to Ashland. As a result, we were not able to take advantage of favorable markets as we had planned. . . ." Def.'s Mot. App. 8–9. Those individuals involved in Croman's 1999 claim preparation process held the reasonable belief, "after a review of the facts and circumstances, including . . . the level of operations at Boise, . . . [that] Croman certainly could have run additional logs in the amount of at least 6,481 MBF through its Boise sawmill, such as by adding Saturday operations." Pl.'s Resp.App. 73. Before executing and submitting the claim letter to the contracting officer, Mr. Arnold Cross, Croman's co-founder and secretary, reviewed the letter and "confirmed with Ms. Hicken . . . that the calculations and statements supporting the calculations in the claim were cor-

rect." Pl.'s Resp.App. 77–78. Plaintiff's claim that it could have processed the additional logs at its Boise sawmill in FY 1993 is not objectively baseless.

b. Whether Croman Would Have Processed Additional Logs at Its Boise Sawmill in FY 1993

Defendant argues that deposition testimony and other documentation indicate that "Croman would not have processed additional logs at its Boise sawmill during FY 1993." Def.'s Reply 4. Instead, "Croman potentially lost the *opportunity* to keep logs in reserve and use them later, *i.e.*, approximately 1997 or 1998, to keep the Boise sawmill operating longer." *Id.* at 2. Those individuals involved in Croman's 1999 claim preparation process held the reasonable belief, "after a review of the facts and circumstances, including the quality of the wood transferred from Boise to Ashland[ ][and] the market for lumber products during FY 1993 . . . [that] Croman certainly could have run additional logs in the amount of at least 6,481 MBF through its Boise sawmill, . . . and in light of the exceptionally strong market for lumber products, Croman would have done so." Pl.'s Resp. App. 73. At this stage, the court does not agree with defendant that Croman's claim that it would have processed the additional logs in 1993 is objectively false and warrants the reopening of fact discovery to determine plaintiff's subjective basis for its assertion and to evaluate potential fraud counterclaims in the case.

The court notes that, because of the government's suspension of the Clearview timber sale, plaintiff was faced with the task of constructing a but-for world in analyzing its damages and putting forth its claim. The decision of whether to process the additional logs in FY 1993 or at a later time was a matter within Croman's business judgment. *See* Oral Argument of July 27, 2010, Argument of Mr. William Rayel at 10:28:00–10:28:28. Whether Croman is entitled to damages based on its assertion that it would have processed the additional logs in FY 1993 is not before the court at this juncture. *See* Pl.'s Resp. 13 n. 15 ("[E]ven if the impacts at the Boise sawmill due to the transfer

of logs to Ashland were felt later in time, this is simply a basis for the government to dispute *when* the damages occurred."); Def.'s Reply 4 n. 6 (stating that " 'when' the additional logs would have been processed was an important fact" affecting the amount of damages based on the value of the logs in any given year).

## IV. Conclusion

For the foregoing reasons, the court DENIES defendant's Motion to Reopen Fact Discovery.

IT IS SO ORDERED.